CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 28 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

GLORIA M.,[1]                        )
        Plaintiff,                )        Civil Action No. 4:20-cv-00044
                   )
v.                                   )        MEMORANDUM OPINION
                   )
KILOLO KIJIKAZI,                     )        By:   Joel C. Hoppe
Acting Commissioner of Social Security, )          United States Magistrate Judge
        Defendant.[2]             )

Plaintiff Gloria M., proceeding pro se, asks this Court to review the Commissioner of

Social Security's final decision denying her application for disability insurance benefits ("DIB")

under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before

me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 9. Having considered the

administrative record, the parties' filings, and the applicable law, I cannot find that the

Commissioner's denial of benefits is supported by substantial evidence. Accordingly, the

decision will be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Gloria applied for DIB in March 2018, *see* Administrative Record ("R.") 160–161, ECF No. 15, alleging disability because of keratoconus, headaches, arthritis, sleepless nights, concussion, and back and neck injuries from an automobile accident. R. 174. She alleged that she became disabled on December 20, 2017. R. 160. She was forty-four years old, or a "younger person" under the regulations, on her alleged onset date. R. 91; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in August 2018, R. 91–104, and upon reconsideration that October, R. 106–19. In August 2019, Gloria appeared with counsel and testified at an administrative hearing before ALJ Theodore Kennedy. *See* R. 71–84. A vocational expert ("VE") also testified at the hearing. R. 84–90.

ALJ Kennedy issued an unfavorable decision on September 5, 2019. R. 10–20. He found that Gloria had not engaged in substantial gainful activity since her alleged onset date. R. 12. Gloria had "severe" impairments of bilateral knee arthritis, left hand carpal tunnel syndrome, and obesity. *Id.* "[A]ll other impairments . . . alleged and found in the record [were] non-severe, as they ha[d] been responsive to treatment and/or cause[d] no more than minimal work-related

limitations." *Id.* None of Gloria's "severe" impairments met or equaled the relevant Listing. R. 12–13 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02). ALJ Kennedy then evaluated Gloria's residual functional capacity ("RFC") and determined that she could perform "light"[4] work with additional limitations. R. 13. Specifically, she could lift/carry ten pounds frequently and twenty pounds occasionally; could stand/walk for about six hours and sit for about six hours in an eight-hour workday; could frequently handle, finger, feel, or push or pull with her left hand; had no limitations on the use of her right hand; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, or crawl; and could never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights. R. 13.

Based on this RFC finding and the VE's testimony, ALJ Kennedy found that Gloria could have returned to her past relevant work as a customer service clerk in a marketing call center as that "sedentary"[5] occupation was "actually and generally performed." R. 18–19 (citing R. 85–86, 175, 192). He alternatively found that she could have performed the requirements of certain "light" occupations existing in significant numbers in the national economy, R. 19, including routing clerk, information clerk, and retail marker/garment tagger, R. 20 (citing R. 85–

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 13. Someone who "can do light work . . . can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires six hours of standing and/or walking during an eight-hour day, SSR 83-10, 1983 WL 31251, at *5–6, while sedentary work only requires about two hours, *Neal*, 2010 WL 1759582, at *2.

88). ALJ Kennedy therefore found Gloria "not disabled" from December 20, 2017, through the date of his decision. R. 20. The Appeals Council denied Gloria's request for review, R. 1–6, and this appeal followed.

### III. Discussion

Gloria is representing herself in this case. Accordingly, the Court must "liberally" construe her filings "to allow for the development of a[ny] potentially meritorious claim." *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam). Liberally construing Gloria's arguments, she raises five challenges to ALJ Kennedy's decision. *See generally* Pl.'s Br. 2–5, ECF No. 18. First, she argues that the ALJ erred by failing to consider her obesity and arthritis when assessing her RFC. *Id.* at 2–3. Gloria then asserts that ALJ Kennedy overlooked "approximately five (5) medical conditions" when assessing her RFC, but she does not identify those impairments. *Id.* at 3. Next, she contends that her exertional and manipulative limitations compel a conclusion that she is restricted to "less than the full range of sedentary work." *Id.* at 4. (emphasis omitted). Gloria additionally argues that she would likely miss at least two days of work each month, which the VE testified would preclude her from maintaining competitive employment. *Id.* (citing R. 86–87). Finally, she contends that ALJ Kennedy erred by rejecting the opinion of DDS reviewer Daniel Camden, M.D., that she was limited to standing and walking for at most four hours in an eight-hour day. *Id.* at 5 (citing R. 100). Gloria's final argument is persuasive.

The question of whether Gloria was disabled is for the Commissioner to decide. The fundamental question before the Court today is "whether the ALJ's finding that she [was] *not disabled* is supported by substantial evidence and was reached based on a correct application of the relevant law." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added). ALJ Kennedy's decision does not meet these minimum standards. The ALJ offered a legally deficient

explanation as to why he rejected Dr. Camden's medical opinion that Gloria could "stand and walk for four hours total . . . in an eight-hour workday," R. 16 (citing R. 100), and instead found that Gloria could "stand and walk for about six hours" in an eight-hour day, R. 13. *See* SSR 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted.") (July 2, 1996). Thus, I find that the decision is not supported by substantial evidence and remand is warranted.

A.    *Summary*

    1.    *Relevant Medical Evidence*

On December 20, 2017, Gloria was involved in an automobile accident in Roanoke, Virginia. *See* R. 259, 284–91, 334, 346. Following the accident in Roanoke, Gloria drove to the Morehead Memorial Hospital in Eden, North Carolina, *see* R. 259, where she was diagnosed with a facial contusion. R. 263. CT scans of Gloria's head and cervical spine were normal. R. 280–81. Two days later, Gloria presented to the McKinley Chiropractic Center reporting muscle strains, soreness, and stiffness in her neck, shoulders, back, arm, leg, and hand. R. 289–99. In January 2018, Gloria went to the emergency department ("ED") complaining of ongoing left-sided headaches with a pulling sensation in the right side of her neck since the accident. R. 333–34. On exam, she displayed right and left sided cervical paraspinal muscle tenderness and tension extending into her trapezius muscles, negative straight leg raising test, normal range of motion ("ROM") in all extremities, and full ROM in her neck. R. 334. The attending physician discharged her home in stable condition. R. 335. In February, Gloria presented to orthopedist Robert E. Cassidy, M.D., complaining of back and neck pain and "occasional" headaches since her accident. R. 326. On exam, Gloria was "slightly overweight in some discomfort," had tightness and tenderness in the posterior cervical paraspinous muscles and traps bilaterally,

exhibited "a 20% will limitation of motion in the cervical spine secondary to pain," endorsed tenderness in the mid-lumbar spine "with pain on motion and a 30% global limitation of motion secondary to pain," had a negative straight leg raising test, and she could get up on her heels and toes and had no issues with balance. R. 327–28. Dr. Cassidy assessed cervical strain and back strain, recommended physical therapy, started her on Diclofenac, and ordered Gloria to follow up in six weeks. R. 328.

In early March, Gloria saw Dr. Cassidy for "persistent" neck and lower back pain. R. 320. She rated her pain an eight-out-of-ten and said it kept her up at night. *Id.* Dr. Cassidy noted some "mild" degenerative joint disease in her lower back on a lumbar spine radiograph film that Gloria brought with her. *Id.* On exam, Gloria was "slightly overweight . . . in obvious discomfort," exhibited tenderness in the posterior cervical paraspinous muscles with limited motion "especially in right rotation and side bending," had positive straight leg raising test with back pain on the right and hip pain on the left, exhibited grossly normal muscle strength, and a 20% global limitation of motion of the lumbosacral spine secondary to pain. R. 323. Dr. Cassidy assessed cervical and back strain, and cervical and lumbosacral degenerative disc disease. *Id.* Gloria saw Dr. Cassidy again in mid-March. R. 315. She complained of pain in her neck radiating down her arms with occasional numbness and tingling, and she rated her pain a seven-out-of-ten. *Id.* Examination revealed minimal discomfort while sitting, tenderness in her cervical paraspinous muscles, and minimal tenderness in the lower lumbar area. R. 318. Dr. Cassidy assessed cervical strain, back strain, and cervical and lumbosacral degenerative disc disease. *Id.* Gloria saw Dr. Cassidy again in late March to review her cervical MRI, which was "completely normal." R. 305. Gloria reported that she was "not having neck pain," which Dr. Cassidy thought was noteworthy considering that Gloria had reported neck pain at "virtually every visit" to his

clinic. *Id.* He noted that Gloria then "essentially called [him] a liar[,] stating that she never told [him] that" even though "it is in all her records." *Id.* Dr. Cassidy explained to Gloria that she "could return to work at light duty" based on her "normal cervical MRI and no s[u]rgical pathology in her lower back." *Id.*; *see* R. 603–04 (cervical MRI with "[n]o evidence of disc herniation, spinal stenosis, nerve root encroachment or abnormal cord signal") (Mar. 24, 2018); R. 605–06 (lumbar MRI showing diffuse mild to moderate lumbar facet degeneration, negative disc spaces, no impingement, no fracture, deformity, or malalignment) (March 9, 2018). Gloria responded, "I am NOT going back to work" because she was in too much pain "to return to work of any sort." R. 305. At that point, Dr. Cassidy told Gloria that she needed to "find another doctor." Dr. Cassidy did not perform an examination that day, but Gloria "was observed to be moving about the room on the table with no evidence of having any pain whatsoever." R. 308. His assessment was unchanged, *id.*, and he dismissed Gloria from the practice, R. 309.

Gloria saw Stuart J. Kramer, M.D., in early April, reporting continued lower back pain, neck pain and stiffness, and occasional numbness in her fingers. R. 383. Dr. Kramer assessed cervical, thoracic, and lumbar pain, *id.*, and he did "not see anything further that she has not had that need[ed] to be done," R. 384. He ordered Gloria to continue her exercise program and said she could take anti-inflammatories. *Id.* Later in April, Gloria complained of back and leg pain to orthopedic surgeon Xudong Li, M.D., of the University of Virginia Health System. R. 346–47. On exam, she displayed normal tandem gait, negative Hoffman's sign, normal heel and toe gait, and negative straight leg raising test. R. 348. Dr. Li suggested that Gloria undergo physical therapy and possibly steroid injections for pain management, but "she was discharged in a stable condition with no concerning red flag signs or symptoms." *Id.*

In May, Gloria presented to Danville Neurology Associates for an evaluation of her headaches. R. 386. Her neck pain had improved, but she still had constant back pain, and she reported daily headaches, numbness in her hands, ringing in her ear, stiffness and arthritis, blurry vision, and intermittent postural dizziness. *Id.* Physical exam findings were unremarkable with full strength and sensation, and a neurological exam revealed negative Romberg's test. R. 387. She could heel and toe walk and perform tandem walking. *Id.* Victor Owusu-Yaw, M.D., diagnosed carpal tunnel syndrome and provided injections, and his ongoing diagnoses included migraines, post-concussion syndrome, sprain of ligament of cervical spine, tension-type headache, low back pain, and insomnia. R. 388; *see also* R. 402–04 (no remarkable exam findings after making similar reports to Dr. Owusu-Yaw) (June 25, 2018).

In June, Gloria presented to Mark Hermann, M.D., and reported hand pain. R. 381. It was noted that the injections she received from Dr. Owusu-Yaw offered no relief and she was "having marked neural symptoms her left-hand tingling and numbness and aching." *Id.* Gloria wanted to have surgery for her carpal tunnel syndrome. *Id.*; *see* R. 408–09 (motor and sensory nerve studies showing "moderate" left and "mild" right carpal tunnel syndrome). She underwent a surgical release of left carpal tunnel on June 11, 2018, and she tolerated the procedure well. R. 467.

In July, Gloria saw Dr. Owusu-Yaw again, complaining of worsening headaches, pain in her toes and calves, and pain radiating from her feet to her back. R. 537. Dr. Owusu-Yaw noted that Gloria had tried physical therapy and chiropractic treatment for her back pain and that she reported headaches occurring four or five days a week that were accompanied by light and noise sensitivity "about once a month." *Id.* Examination revealed full ROM in all extremities, full strength and normal bulk and tone, negative Romberg's test, and she could walk on her heels and

toes and perform tandem walking. R. 538. Dr. Owusu-Yaw diagnosed unspecified neuralgia and neuritis, and paresthesia of the skin. R. 539.In August, Gloria followed up with Dr. Hermann regarding her hand pain, and she was noted to be "doing great in terms of her neural improvement." R. 568. She expressed concern over sensitivity at the incision line, and an examination showed "just a little bit of induration on any redness or more just some fibrous on the scar" and good neural function. *Id.* and Dr. Hermann assured her that she could expect continued improvement. *Id.*

A thoracic MRI performed in September 2018 showed "[c]entral disc protrusion at T4-5 exerting mass effect on the thoracic spinal cord without impingement." R. 574. Later in September, Gloria established care with James Dailey, M.D. R. 559. She complained of worsening mid-back pain radiating to her leg. *Id.* On exam, Gloria displayed decreased lumbar flexion and extension, tenderness to palpation in her thoracic spine, and negative straight leg raising test. R. 560. Dr. Dailey noted that she had failed acupuncture and chiropractic treatment. *Id.* He planned to administer epidural steroid injections for her thoracic pain, and he noted complaints of axial pain, but wanted to treat her radicular component first. *Id.* Kurt Voos, M.D., reviewed an MRI that he found showed fact arthropathy at L3-L4. R. 721. He noted that injections had provided relief, and he recommended that Gloria try a spinal-cord stimulator. R. 721.

In October, Gloria complained of cervical pain and left knee pain to Dr. Hermann. R. 557. Examination revealed "good mobility of her neck with some discomfort when she extends the neck and mild tenderness in the paracervical region," as well as "mild" patellofemoral crepitus in her left knee with no significant deformity or loss of motion. R. 558. Dr. Hermann referred Gloria to PT for her neck. *Id.*

In January 2019, a lumbar MRI revealed "mild" degenerative disc disease at L5-S1, "mild" bilateral foraminal stenosis associated, without nerve root impingement, and "minimal" degenerative disc disease otherwise. R. 633; *see also* R. 728–29 (Dr. Dailey assessing lumbar radiculopathy) (Feb. 6, 2019). In May, Gloria complained of right shoulder pain and low back pain radiating to her left foot, and she reported "constant focal numbness and tingling" and difficulty sleeping. R. 705. Examination of her low back revealed decreased ROM, pain with extension, SI joint tenderness, and bilateral paraspinal spasms. *Id.* She had full cervical ROM and no tenderness, negative straight leg raising tests, and normal extremity strength throughout. *Id.* Waltus Gill III, M.D., noted that Gloria had tried injections and physical therapy with no relief. R. 706. He assessed sacroiliac joint pain, low back pain, and arthropathy of the lumbar facet joint, and he ordered her to follow up in two weeks. *Id.*; *see also* R. 708–10. A lumbar MRI performed in May was unremarkable. R. 711. Later in May, Gloria followed up with Dr. Dailey and his examination findings were unchanged from Gloria's September 2018 visit with him. R. 716; *see also* R. 714 (Dr. Dailey administering injections) (June 4, 2019).

      *2.     DDS Reviewers' Opinions*

In August 2018, DDS reviewer, Daniel Camden, M.D., evaluated Gloria's RFC based on her "severe" degenerative disc disease ("DDD") of the cervical and lumbar spine, obesity, and migraines, as well as her "non-severe" carpal tunnel syndrome. *See* R. 98–101. He found she could lift and/or carry ten pounds frequently and twenty pounds occasionally; stand/walk for four hours, and sit for about six hours, in a normal eight-hour workday; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, and frequently balance; never climb ladders/ropes/scaffolds; and needed to avoid even moderate exposure to extreme cold, vibration, and hazards. R. 99–101. Dr. Camden attributed these functional limitations to Gloria's symptoms

related to obesity, headaches, "and c-spine and l-spine abnormalities," R. 100, including pain, loss of sensation, and weakness, which he found to be "substantiated by the objective medical evidence alone," R. 99. DDS reviewer Robert McGuffin, M.D., opined to similar exertional limitations in October 2018, except he found Gloria could stand and/or walk for "about six hours" in an eight-hour day. R. 114. He attributed these slightly less restrictive exertional limitations to Gloria's history of back pain, arthritis, and carpal tunnel syndrome post-release, as well as objective medical evidence showing "disc protrusion in the thoracic spine, degenerative changes in the cervical spine," and "[t]enderness in neck," but "[n]o issues with strength of ambulation" or "loss of motion" in the left knee. *Id.*; *see also* R. 113 (opining that Gloria's statements describing the intensity, persistence, and functionally limiting effects of her pain, loss of sensation, and weakness were not "substantiated by the objective medical evidence alone"). Dr. McGuffin also opined that Gloria could frequently climb ramps/stairs, balance, and stoop; and occasionally climb ladders/ropes/scaffolds, kneel, crouch, and crawl. R. 114–15. He did not find that Gloria had any environmental limitations. R. 115.

B.     *The ALJ's Decision*

ALJ Kennedy found that Gloria suffered from "severe" impairments of bilateral knee arthritis, left hand carpal tunnel syndrome, and obesity. R. 12. In assessing Gloria's RFC, ALJ Kennedy summarized Gloria's subjective statements regarding her symptoms, R. 14, summarized the objective and other medical evidence, R. 14–16, and evaluated the opinion evidence of record, R. 16. In evaluating the medical opinions, the ALJ noted that Dr. Camden "opined [Gloria] could lift and/or carry 20 pounds occasionally and 10 pounds frequently, and stand and walk for four hours total and sit for about six hours total in an eight-hour workday with postural and environmental limitations." R. 16. He also noted that Dr. McGuffin "affirmed the

aforementioned assessments upon reconsideration with the exception of standing and walking for

six hours and no environmental limitations." *Id.* ALJ Kennedy found these opinions "somewhat

persuasive and supported by their review of the record evidence." *Id.* He specifically noted that

both reviewers' "opinions of frequent and occasional stooping, kneeling and crawling," as well

as Dr. Camden's limiting Gloria's exposure to heights were "supported by their review of lower

extremity weakness, limping gait, arthritis, and carpal tunnel syndrome and release." R. 16–17.

Further, the ALJ found the DDS reviewers' opinions were "somewhat consistent with the

medical evidence of record as a whole to the extent of their review of clinical findings,

examinations, and imaging, which support the claimant is capable of light exertional

limitations." R. 17. Nonetheless, ALJ Kennedy found that "the evidence in this case depicts even

greater limitations due to [Gloria's] ongoing musculoskeletal conditions exacerbated by obesity

and thereby adjusts limitations to the residual functional capacity as set forth herein." *Id.* Lastly,

he noted that "the State agency consultants had neither an opportunity to personally examine the

claimant nor the complete medical evidence of record for review." *Id.*

ALJ Kennedy concluded that Gloria maintained an RFC to perform a range of "light"

work. R. 13. Specifically, she could lift/carry ten pounds frequently and twenty pounds

occasionally; could stand/walk for about six hours and sit for about six hours in an eight-hour

day; could frequently handle, finger, feel, or push or pull with her left hand; had no limitations

on the use of her right hand; could occasionally climb stairs/ramps, balance, stoop, kneel, crouch,

or crawl; and could never climb ladders/ropes/scaffolds or be exposed to unprotected heights. *Id.*

At step four, ALJ Kennedy concluded that Gloria was not disabled after December 2017 because

her RFC would have allowed her to do her "past relevant work as a customer service clerk" in a

marketing call center, as that "sedentary" occupation was "actually and generally performed." R.

18–19 (citing R. 85–86, 175, 192). He did not identify which of this job's specific "physical and mental demands," if any, he purportedly compared to Gloria's RFC in reaching that conclusion. R. 19 ("In comparing the claimant's [RFC] with the physical and mental demands of this work, the undersigned [ALJ] finds that the claimant is able to perform it as actually and generally performed."). Alternatively, ALJ Kennedy found that Gloria was not disabled because she could have performed certain "light," unskilled occupations (e.g., routing clerk, information clerk, retail marker/garment tagger) that offered a significant number of jobs in the national economy. R. 19–20.

C.      *Analysis*

Gloria primarily challenges the ALJ's RFC finding that she could perform "light" work, including that she could stand/walk for about six hours in an eight-hour workday. *See generally* Pl.'s Br. 2–5. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

In determining a claimant's RFC, the ALJ will evaluate the medical opinion evidence of record. For claims filed after March 27, 2017, a "medical opinion" is a statement from a

"medical source"[6] about what a claimant can do despite his or her impairments and whether one or more impairments causes limitations or restrictions in the ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources" or from the DDS physicians who review the claimant's records. *Id.* § 404.1520c(a). Instead, the ALJ must adequately explain whether and to what extent every medical opinion in the record is persuasive. *See id.* § 404.1520c(b). The regulations instruct that supportability and consistency are "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. *See id.* § 404.1520c(b)(2), (c)(1)–(2). In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(1). With respect to consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2). The ALJ may, but is generally not required to, explain how he or she considered other factors, including the medical source's specialization and relationship with the claimant. *Id.* § 404.1520c(c)(3)–(5).

---

[6] A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d).

Here, in evaluating the DDS reviewers' opinions, the ALJ never explained why he rejected Dr. Camden's specific opinion that Gloria was limited to only four hours of walking/standing in an eight-hour workday. *Compare* R. 13 ("She can stand and walk for about six hours . . . in an eight-hour day."), *with* R. 16–17 (noting that "Dr. Camden opined the claimant could . . . stand and walk for four hours total . . . in an eight-hour workday," whereas Dr. McGuffin's opinion allowed "standing and walking for six hours," but finding both opinions were only "somewhat persuasive" in part because the record showed Gloria had "even greater limitations due to [her] ongoing musculoskeletal conditions exacerbated by obesity"). Despite the regulatory changes regarding the evaluation of medical opinions, SSR 96-8p continues to provide that where "the RFC assessment conflicts with an opinion from a medical source, the [ALJ] *must explain* why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (emphasis added); *see also Michael B. v. Saul*, No. 7:19cv751, 2020 WL 7497803, at *7 (W.D. Va. Dec. 21, 2020). ALJ Kennedy's RFC finding that Gloria could stand and/or walk for six hours in an eight-hour workday plainly conflicts with Dr. Camden's opinion that Gloria was limited to only four hours of standing/walking in an eight-hour day. Thus, the ALJ was required to explain why he rejected this finding by Dr. Camden. *See David H. v. Saul*, No. 5:19cv14, 2020 WL 7220810, at *7 (W.D. Va. July 1, 2020); SSR 96-8p, 1996 WL 374184, at 7. ALJ Kennedy evaluated the "consistency" and "supportability" of Dr. Camden's opinions to a certain degree, but none of the factors he discussed, or anything else in his decision, makes clear why he rejected this specific limitation.

In fact, based on ALJ Kennedy's analysis, he appears to have been in relative agreement with both DDS reviewers' opinions overall. *See* R. 16 ("The [ALJ] has considered these opinions as somewhat persuasive and supported by their review of the evidence, which is documented in

their summaries."). For instance, he found that "their opinions of frequent and occasional

stooping, kneeling, and crawling as well as avoidance of heights in the initial opinion," were

"supported by" their review of the evidence, R. 16, and he found "these opinions [were]

somewhat consistent with the medical evidence of record" that they were able to review in 2018,

R. 17. Indeed, it appears from the decision that the ALJ's primary issue with the DDS reviewers'

opinions was that they were not restrictive enough. *Id.* ("However, the [ALJ] finds the evidence

in this case depicts even greater limitations due to the claimant's ongoing musculoskeletal

conditions exacerbated by obesity and thereby adjusts limitations to the residual functional

capacity as set forth hereinabove.").

      The ALJ did not explain why, despite finding that much of Dr. Camden's opinion was

"supported" by his review of the evidence and "somewhat consistent" with the other evidence of

record, but not quite restrictive enough, the ALJ nonetheless rejected the most restrictive

limitation in the DDS assessments. *See David H.*, 2020 WL 7220810, at *7 (reversing and

remanding where ALJ did not explain how she found that DDS physician's conflicting

assessments of claimant's ability to stand/walk were both "generally consistent with the medical

evidence" or why she rejected the less-restrictive opinion in finding claimant could stand/walk

for four hours); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 3285756, at *11 (W.D. Va. Aug. 8,

2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to

adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great

weight to in arriving at his decision."). Indeed, contrary to the ALJ's assertion that he

"adjust[ed]" his RFC finding to accommodate "even greater limitations" that he found

attributable to Gloria's "ongoing musculoskeletal conditions exacerbated by obesity," his RFC

finding is, in material respects, less restrictive than Dr. Camden's medical opinion. Not only did

the ALJ's RFC finding not include the four-hour standing/walking limitation, it also did not include any limitations on Gloria's exposure to extreme cold and vibration, whereas Dr. Camden opined that Gloria needed to avoid even moderate exposure to both. *Compare* R. 13, *with* R. 101. The ALJ's RFC finding *is* consistent with Dr. McGuffin's medical opinion on those points, *see* R. 16 (citing R. 115), but he did not explain why he apparently found Dr. McGuffin's opinions more persuasive. *See David H.*, 2020 WL 7220810, at *7; *Woodhouse ex rel. Taylor v. Astrue*, 696 F. Supp. 2d 521, 533 (D. Md. 2010) (an ALJ must do more than point out conflicts in the evidence; she must explain how she considered and resolved them in reaching her conclusions). ALJ Kennedy's failure to resolve those material conflicts means his RFC "analysis is incomplete and precludes meaningful review." *Monroe v. Colvin*, 826 F.3d 176, 190 (4th Cir. 2016).

The Commissioner does not acknowledge this legal error, and therefore does not argue that it was harmless. *See generally* Def.'s Br. 1–27, ECF No. 20. "Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009). ALJ Kennedy's error was not harmless at step five, where he concluded Gloria's RFC allowed her to do certain "light" occupations that required standing/walking up to six hours in an eight-hour workday. The ALJ did not ask the VE if a hypothetical person could do those occupations if she was further limited to standing/walking four hours in an eight-hour workday. Thus, even if the ALJ's RFC finding did limit Gloria to four hours standing/walking, there is no evidence in her record to support the conclusion that she could do the occupations that the VE identified and ALJ Kennedy relied upon in denying benefits at step five.

Dr. Camden's opinion is not necessarily inconsistent with ALJ Kennedy's conclusion at step four that Gloria was not disabled because she could return to her "past relevant work as a

customer service clerk" in a marketing call center, as that sedentary occupation was "actually and generally performed," R. 18–19 (citing R. 85–86, 175, 192). Sedentary work typically requires only about two hours standing/walking in an eight-hour workday. *Neal*, 2010 WL 1759582, at *2. The problem, however, is that ALJ Kennedy did not identify which of this job's specific "physical and mental demands," if any, he compared to Gloria's RFC in concluding she could meet those demands. R. 19.

At step four, the claimant bears the burden of persuading the Commissioner that she cannot perform her past work "either as [she] actually performed it" or as it is "generally performed in the national economy." *Goodman v. Astrue*, 539 F.Supp.2d 849, 850 (W.D. Va. 2008) (citing 20 C.F.R. §§ 416.920(f), 416.960(b)). The ALJ must make specific findings as to: (1) the claimant's RFC; (2) the physical and mental demands of the past job or occupation; and (3) whether the claimant's RFC would permit him or her to meet those demands. *Prim v. Astrue*, No. 7:07cv213, 2008 WL 444537, at *6 (W.D. Va. Feb. 13, 2008). While the VE's testimony and resources like the *Dictionary of Occupational Titles* ("DOT") can inform the ALJ's findings on the second and third issues, the ALJ cannot "simply delegate [ ] his fact finding responsibly to a VE" at this stage of the disability determination process. *Id.* at *7 (citing *Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428 (6th Cir.1999); *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir.1996)). Rather, the Commissioner's rules set out "thorough standards of inquiry," *Woody v. Barnhart*, 326 F. Supp. 2d 744, 750 (W.D. Va. 2004), for ALJs to resolve this potentially dispositive "issue as clearly and explicitly as circumstances permit," SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982). The ALJ must "show clearly how specific evidence leads to a conclusion," and that conclusion "must be developed and explained fully in the disability decision." SSR 82-62, 1982 WL 31386, at *3–4.

ALJ Kennedy's step-four assessment was legally "insufficient because it relied solely on the VE's testimony and failed to make specific factual findings on the record as to how [Gloria's] physical limitations would allow [her] to perform [her] previous work," *Parker v. Astrue*, 664 F. Supp. 2d 544, 556–57 (D.S.C. 2009) (citing SSR 82-62, 1982 WL 31386, at *3–4), as a call-center customer service clerk, R. 19. Gloria's record contains no information about that job's physical or mental demands as she "actually" performed it. R. 19. ALJ Kennedy knew only her job title ("Customer Service Rep."), the type of business ("call center"), the dates she worked in that position, R. 192, and her weekly hours and hourly rate of pay, R. 175. Thus, there is no evidentiary support for ALJ Kennedy's denial of benefits based on his finding that Gloria could do that job as "actually" performed. *See Bolden v. Colvin*, No. 4:14cv32, 2014 WL 4052856, at *16–17 (W.D. Va. Aug. 14, 2014). The VE testified that Gloria's record showed "she was a customer service clerk in a call center," which is listed in the DOT as a "sedentary," skilled position, R. 85 (citing *DOT* § 249.262-010), and that someone with Gloria's light RFC could do that job, R. 86 ("That is a sedentary position. So if one can do light work, one can do sedentary work."). ALJ Kennedy did not identify any "physical [or] mental demands of this work" before relying on the VE's barebones testimony to support his conclusion that Gloria was not disabled because she could meet those demands as "generally performed." R. 19 (citing R. 85–86). This lack of explanation requires reversal and remand. *See, e.g.*, *Parker*, 664 F. Supp. 2d at 556–57 (collecting cases).

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 19, **REVERSE** the Commissioner's final decision, **REMAND** the

matter for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

A separate Order shall enter.

ENTER: March 28, 2022

Joel C. Hoppe
United States Magistrate Judge